JAMES M. DUNCAN & others *vs.* NEW ENGLAND POWER COMPANY.

Franklin.   September 17, 1924. — November 12, 1924.

Present: RUGG, C.J., BRALEY, CROSBY, PIERCE, & WAIT, JJ.

*Mill Act. Damages;* Damnum absque injuria, From blockade caused by ice in dammed stream.   *Water and Watercourse.*

On exceptions saved by a plaintiff at the trial of a petition for the assessment of damages under the mill act, where the trial judge ordered a verdict to be entered for the respondent, a long exposition by the judge to the jury of the law relating to the subject is irrelevant to any question presented by the exceptions and its inclusion in the printed record is a needless expense.   Per RUGG, C.J.

Whatever use the owner of land on a stream may make of the waters of the stream without liability for damages at common law he also may make without liability under the mill act.

A dam on the Deerfield River in Shelburne Falls formed a pond or reservoir extending about a mile upstream to a point, varying according to the height of the water of the pond, from the lower end of Buckland Island to about one half the distance along its side.   In the winter time the ice froze thicker in the pond than in the stream above it, and when the ice in the stream broke up, successive stoppages were made as it reached the thicker ice, causing ice jams or blockades, and a flowing of ice and a deposit of debris on adjoining land resulting in damage to the owners thereof.   Such owners brought a petition under the mill act against the owner of the dam, at the trial of which the judge ordered a verdict for the respondent.   *Held*, that there could have been no recovery for such damage at common law and therefore the respondent was not liable under the mill act.

PETITION, filed in the Superior Court on May 21, 1923, by James M. Duncan, Florence M. Duncan, Benjamin Florence S. French, H. Wells French, Benjamin F. Barnes, Charles H. Ballard, Luanna J. Manning, Hattie I. Dickinson, and James P. Roberts, for the assessment by a jury of damages alleged to have been suffered by them respectively by reason of the flooding of their land as described in the opinion.

There was a trial in the Superior Court before *Lummus,* J. Material evidence is described in the opinion. At the close of the evidence, after the exposition to the jury described in the opinion, the judge ordered a verdict to be returned in the following form:

" (1) By order of the court, the jury assess the amount of damages sustained by each petitioner within three years last preceding the filing of the petition and to the date of this verdict by reason of the respondent's dam in the amount of nothing.

" (2) By order of the court, the jury find and determine that the amount which, paid annually to each petitioner would be a just and reasonable compensation for the damages that may be hereafter caused by the respondent's dam, so long as it is maintained at the present height, is the amount of nothing.

" (3) By order of the court, the jury find and determine that the amount in gross which would be a just and reasonable compensation for all damages hereafter to be caused to each petitioner by the use of the dam so long as it is maintained at the present height and for the right so to maintain it forever is the amount of nothing."

The petitioners alleged exceptions.

*H. J. Field,* (*M. J. Levy* with him,) for the petitioners.

*F. W. Knowlton,* (*F. J. Dunn* with him,) for the respondent.

RUGG, C.J. This is a complaint for damages under the mill act. G. L. c. 253. The case comes before us on exceptions to a ruling of the judge to the effect that the petitioners were not entitled to recover. There is printed as a part of the bill of exceptions a long exposition to the jury by the judge of the law relating to the subject. This was a

needless expense and under the circumstances was irrelevant to any question presented by the exceptions. *Cohen* v. *Berkowitz*, 215 Mass. 68, 71. *Churchill* v. *Churchill*, 239 Mass. 443, 445.

The pertinent facts are that the defendant completed and began operating its dam and mill on the Deerfield River in Shelburne Falls in 1912. The general contour and appearance of the banks and bed of the Deerfield River above said dam and the island therein have remained without substantial change as they were before the dam was built. The pond or reservoir made by this dam extended upstream about one mile, varying according to the height of the water at the dam. About a mile above the dam in the bed of the river is an island called Buckland Island. The upper end of the mill pond of the defendant varied from a point somewhat below the lower end of the island to a point up the stream about half way by the island, according to the height of the pond and the head of water at the dam. The Deerfield River is a mountainous stream liable to quick rises. At no time, however, since the dam was built, under open water conditions without ice has the river bed been unable to take care of all the water coming down, whether in freshet times or not, and at no time since the dam was built have any of the properties of the petitioners been flooded by high water nor has the river ever overflowed its banks under open river conditions without ice. The water in the mill pond when unaffected by ice does not in any manner affect the petitioners' lands. Prior to the building of the dam, with the exception of one or two years when some water and ice came upon the lands of some of the petitioners without damage, no overflow of water or ice had been known to come on to the lands now owned by the petitioners for over thirty years. Before the dam was built, except as mentioned above, in nearly every winter the river from above the petitioners' lands to the present location of the dam, froze over solidly for several miles above the mill pond and in the breaking up of the ice in the spring, the ice and water would drive through down the river without any serious jamming and with no overflow to its banks except in one or two years. Since the

dam has been built, the still water of the mill pond freezes earlier and thicker than before and lasts longer, the ice coming down the river during the process of freezing in quick water in the river, stops at the thicker ice in the pond and freezes the river over from the upstream end of the mill pond for several miles upstream. Since the dam was built and at the times of the damage complained of, the ice in the river several miles upstream from the properties of the petitioners breaks up first in the spring and as it moves downstream constantly accumulates more ice as it proceeds. Meeting thicker ice at various points the ice is held and checked until the pressure of the water behind it carries away the accumulated ice and the mass moves downstream until it again meets thicker ice. As a result of these successive stoppages, the river becomes dammed behind the jam where it has stopped and water and ice flood the lands of the petitioners whose lands adjoin the river at about that point. The increasing pressure of the water behind the jam causes it in time to move and the same thing happens at the next place of stoppage. Below each successive stoppage the ice in the river to the mill pond and in the mill pond to the dam remains unbroken. When the river finally resumes its bed at a period varying from a few hours to twenty-four hours, the ice is left accumulated in the river bed and upon the shores leaving large fields of ice over many of the acres of the land of the petitioners. The extent of the jams and the extent of the overflow vary with the varying weather conditions of different years. At no time of any of these overflowings were there any unseasonable melting conditions and in the two most severe years in 1915 a drizzling rain accompanied the breaking up of the ice and in 1923 no rainfall.

It was decided in *Fuller* v. *Chicopee Manuf. Co.* 16 Gray, 43, 45, that the mill statutes " were not intended to confer any new right, or to create an additional claim for damages, which did not exist at common law. They only substituted, in the place of the common law remedies, a more simple, expeditious and comprehensive mode of ascertaining and assessing damages to persons whose lands were overflowed

or otherwise injured by the erection and maintenance of dams on the same stream, for the purpose of creating a water power and carrying mills." The principle there was applied by the rejection of a claim for damages under the mill act occasioned to an unimproved or unappropriated mill site by the erection of a dam on the same stream below, on the ground that at common law a riparian proprietor could not recover damages arising from such a cause. The rule is, therefore, that whatever use of the waters of a stream may be made by a riparian proprietor at common law without liability to damages may also be made without liability under the mill act. It was said in *Fuller* v. *Chicopee Manuf. Co.* 16 Gray, 46, with respect to the rule of damages upon a complaint under the mill act, that its manifest purpose is to " secure to a land-owner, whose land has been flowed or directly damaged by water raised by a dam for mill purposes by another on his own land, a fair and adequate compensation for the damage arising directly from that cause. The law does not justify an allowance for remote, possible or speculative damages, or damage to any other subject than land, or by any other means than raising water by a dam for mill purposes."

The case at bar is governed by *Smith* v. *Agawam Canal Co.* 2 Allen, 355. The facts in that case were that the defendant had built its dam across a stream so that the level of the water raised thereby was six feet lower than the lowest part of the wheel of the plaintiff at his mill on a brook confluent to that stream above the dam. Yet, owing to the mountainous nature of the country and the swift and violent course of the streams and the packing of the ice at the time of its breaking up in the spring above the dam the water set back and flooded the plaintiff's wheel to a greater height and a much longer time than before the construction of the defendant's dam. An action of tort was brought for the damages thus sustained. It was said at page 359, " riparian proprietors may erect and maintain dams on their own lands across streams, to raise a head of water for the working of mills, without being liable for consequences which are casual, remote and uncertain. The same general doctrine undoubt-

edly results from the provisions of our statute. It is obviously one of its chief and leading purposes to regulate the enjoyment by the riparian proprietors of their respective rights in such manner that the whole power of the stream, and all the uses to which the entire volume of its running water can be applied in the accomplishment of any beneficial object, shall be distributed among, and availed of by, them. Under such provisions, the maintenance of a dam by any riparian proprietor, who would avail himself of the privilege to which he is entitled, to such height that, in the common and ordinary state of water in the stream, it would not injuriously affect any existing mill, or mill-site upon which a mill or mill dam has been lawfully erected and used, would be only an exercise and enjoyment of his right, and therefore could not subject him to liability for damages arising from an extraordinary accumulation of water by the operation of natural causes. The changes which result from such causes are uncertain in extent and in the times of their occurrence; and the losses of which they are the occasion must be borne by those upon whom they fall."

This principle has been applied in other cases of the utilization of the flowing water of a stream by a riparian proprietor. It was held that there could be no recovery in *Eames* v. *New England Worsted Co.* 11 Met. 570, for offensive smells not amounting to a nuisance arising from flowed land, in *Mason* v. *Whitney*, 193 Mass. 152, for reasonably using water twenty-four hours in the day to the detriment of lower mill owners who could use it only ten hours in each day, in *Gould* v. *Boston Duck Co.* 13 Gray, 442, for using all the flow of the stream on mills adapted to its size in less than a working day and thus letting down more water than the lower riparian proprietor could utilize on his wheel. *Drake* v. *Hamilton Woolen Co.* 99 Mass. 574. *Otis Co.* v. *Ludlow Manuf. Co.* 186 Mass. 89; *S. C.* 201, U. S. 140.

The broad principle which includes these particular decisions is that ordinarily the owner of real estate has the entire dominion over it and hence has a right to make such use of it as he finds for his own advantage, provided he violates no positive rule of law or police regulation, however much such

use may in fact inconvenience or annoy his neighbor.  This principle has many illustrations and is too familiar to elaborate.  *Howland* v. *Vincent,* 10 Met. 371.  *Gannon* v. *Hargadon,* 10 Allen, 106.  *Noyes* v. *Carr,* 228 Mass. 339.  *Jubilee Yacht Club* v. *Gulf Refining Co.* 245 Mass. 60, and cases collected at page 62.

The rights of riparian proprietors with respect to the flow of water in a stream are clear and need not be restated.  *Stratton* v. *Mount Hermon Boys' School,* 216 Mass. 83, 85.  *Taft* v. *Bridgeton Worsted Co.* 237 Mass. 385, 388, 389.  Riparian proprietors, however, are no more secure with reference to their rights in running water than are owners of other real estate.  Reasonable and lawful exercise of like rights by their neighbors higher and lower upon the stream may affect the exercise of their own rights.  We are unable to distinguish the case at bar from *Smith* v. *Agawam Canal Co.* 2 Allen, 355.  Without overruling that decision the plaintiffs cannot recover.  That decision affected the use of real estate and has doubtless become a rule of property.  We are not prepared to overrule it.  The doctrine of *stare decisis* is applicable.  *Mabardy* v. *McHugh,* 202 Mass. 148, 152.  *United States* v. *Title Ins. & Trust Co.* 265 U. S. 472, 486.

*Exceptions overruled.*