HARRY WORCESTER SMITH & another *vs.* NEW ENGLAND
        AIRCRAFT COMPANY, INCORPORATED, & others.

Worcester.   March 8, 11, 21, 1929. — March 4, 1930.

Present: RUGG, C.J., CROSBY, PIERCE, CARROLL, & FIELD, JJ.

*Aircraft.   Nuisance.   Trespass.   Evidence,* Judicial notice.   *Equity Jurisdiction,* To enjoin trespass by aircraft, Retention of suit for assessment of damages.   *Constitutional Law,* Due process of law, Police power, Interstate commerce.   *Equity Pleading and Practice,* Costs, Master.

In considering an appeal from a final decree dismissing a bill in equity to enjoin the use of airplanes over land of the plaintiff at a height between one hundred and one thousand feet, on the ground that such use was a trespass and, continued, resulted in a nuisance, this court took judicial notice of facts of common knowledge concerning navigation of the air.

St. 1922, c. 534, and the preceding legislation in this Commonwealth on the subject of use of aircraft, as well as the "Air Commerce Act of 1926," 44 U. S. Sts. at Large, Part 2, 568, c. 344, and rules promulgated by the Secretary of Commerce under § 10 thereof, not only recognized the existence of air navigation but authorized the flying of aircraft over privately owned land.

For the purposes of the decision of the appeal above described, this court *assumed* that private ownership of airspace extends to all reasonable heights above the underlying land.

The statutes of this Commonwealth regulating the operation of aircraft were enacted under the police power.

Even with the utmost reasonable assumption as to private rights in airspace of the owner of the underlying land, the provisions of St..1922, c. 534, constitute valid regulations of the flight of aircraft in airspace actually unoccupied by the owner of the underlying land.

Review by RUGG, C.J., of decisions that certain invasions of airspace over underlying land by noise, smoke, vibration, dust and disagreeable odors, having been authorized by the legislative department of government and not being in effect a condemnation of the property although in some measure depreciating its market value, must be borne by the landowner without compensation or remedy.

Review by RUGG, C.J., of decisions upholding certain statutes as an exercise of the police power interfering with, narrowing and regulating private rights of landowners in the use of their estates.

The suit above described related to flights by airplanes over the plaintiff's land previous to June, 1928, from a privately owned airport of about ninety-two acres adjoining the plaintiff's land, a country estate, mostly wooded, of about two hundred seventy acres. A master found that the site of the airport was reasonable and proper for a flying field and that it had been properly maintained and reasonably conducted as an airport. Flights over that part of land of the plaintiff which immediately adjoined the airport had been at less than one hundred feet in taking off, but no flights had been at less than five hundred feet over any buildings on the plaintiff's land. There had been no harm to the plaintiff and no flights by excessive numbers of aircraft; the light of the sun had not been obscured and the land had not been shadowed; no airlane of through travel had been established over the land; nothing had been thrown or had fallen from the aircraft upon the underlying ground; there had been no noxious gases or fumes or undue noise; there had been no other interference with any valuable use of which the land of the plaintiff was capable. *Held,* that

(1) So far as concerned property of the plaintiff, the regulation, by the provisions of St. 1922, c. 534, and by § 74 (G) (1) (2) of the regulations of the Secretary of Commerce under § 10 of 44 U. S. Sts. at Large, Part 2, 568, of five hundred feet as the minimum altitude of flight by aircraft could not rightly be pronounced to be in excess of the permissible interference, under the police power and under regulation of interstate commerce, with rights of the plaintiff in the airspace above that height over his land;

(2) One or two instances of flights at less than five hundred but more than one hundred feet over land of the plaintiff within the immediate vicinity of houses and buildings and the possibility of similar flights in the future in the circumstances were not sufficient to require or warrant injunctive relief;

(3) The exceptions in the statutes and regulations above referred to from minimum altitude of five hundred feet for ordinary flight in favor of lower but unspecified altitude in taking off and landing were not intended as legislative limitations upon the rights of landowners in the airspace and did not sanction the flying at an altitude of less than one hundred feet over the plaintiff's land in taking off from and landing at the airport;

(4) Such low flying in taking off and landing constituted a trespass on the plaintiff's land;

(5) It appearing that such trespasses by low flying in taking off and landing were not in the same place as to linear space or altitude, that the plaintiff had sustained no damage to his property or to its use and had suffered no material discomfort, and that no valuable use was to be made of the land over which such low flying occurred either for pleasure or profit, injunctive relief properly was not granted;

(6) Whether the case should have been retained for assessment of damages rested in the sound judicial discretion of the trial judge;

and an appeal from his refusal to do so, especially in view of the fact that, from facts found by the master, at most only nominal damages could have been assessed, presented no error of law;

(7) No constitutional rights of the plaintiff were infringed: there was a valid exercise of the police power of the General Court so far as concerns the Constitution of this Commonwealth and the Fourteenth Amendment to the Federal Constitution, and a valid exercise of the power of the Congress over interstate commerce so far as concerns the Fifth Amendment to the Federal Constitution.

Review by RUGG, C.J., of decisions that certain invasions of the airspace above the land without contact with its surface constitute trespass.

A court of equity has no jurisdiction or authority to assess, as part of costs ordered to be paid by the plaintiff to the defendant by a decree dismissing the bill, an amount which the defendant has paid as his share of the expense of having the evidence taken and written out by a stenographer at the hearing of the suit by a master who by the rule issued to him was directed to "hear the parties and their evidence, find the facts, report the evidence and report to the court his findings together with such facts and questions of law as either party may request."

BILL IN EQUITY, filed in the Superior Court on June 8, 1928, and described in the opinion.

The suit was referred to a master under a rule directing him "to hear the parties and their evidence, find the facts, report the evidence and report to the court his findings together with such facts and questions of law as either party may request." Material facts found by him are stated in the opinion. There were no exceptions to his report. By order of *Lummus*, J., there were entered an interlocutory decree confirming the report and a final decree dismissing the bill and directing the plaintiffs "to pay the defendants' costs amounting to $616.50 and execution is to issue therefor." The record included the following:

DEFTS' COSTS.

| | |
|---|---|
| One half of the cost of the stenographic report of evidence before Master, said half having been paid by the defendants . . . . | $580 25 |
| Witness fees before Master, the amount thereof but not the allowance thereof being agreed to by the parties . . . . . . | 36 25 |
| All other costs waived. | |
| | $616 50 |

There was no statement of findings by the judge of the Superior Court.

The plaintiffs appealed from the final decree.

*C. F. Choate*, for the plaintiffs.

*Jay Clark, Jr.*, (*G. H. Mason* with him,) for the defendants.

RUGG, C.J.   The plaintiffs seek by this suit to enjoin the defendants from flying over their land and buildings in such manner as to constitute a trespass and nuisance and to enjoin the two corporate defendants from using a field adjacent to their land as a base from which such flights may be made.   No money damages are sought.   The case was referred to a master, who filed a comprehensive report. There were no objections in writing to his report.   The evidence is not printed.   Neither side in argument has attacked the facts found by the master.   Therefore they will be accepted as true.

The facts thus disclosed so far as material to the grounds of this decision are these:   The plaintiffs have for many years owned an estate of about two hundred seventy acres known as "Lordvale," located in Grafton.   Upon it are a large and substantial house used as their residence, a library, two small houses, a garage and some other small structures.   Considerable sums of money have been expended by the plaintiffs in improving their grounds and buildings.   Except for lawn, garden, open space near their home and a mowing or two of small size, substantially the entire tract belonging to the plaintiffs is covered with dense brush and woods.   It is used as a country estate and not as a farm.   The district where their land lies had been, prior to the establishment of the air field, largely devoted to agriculture and residence.   The distance from the plaintiffs' residence to the nearest point of the flying field is about three thousand feet.   The defendant Worcester Airport, Inc., acquired in 1927 about ninety-two acres of land in Grafton adjoining the land of the plaintiffs, and surfaced and constructed it as a flying field with runways and hangars.   The expenses of purchase and development of the airport exceed $100,000.   The Worcester Airport, Inc.,

then leased the property to the New England Aircraft Company, Incorporated, a corporation organized under the laws of Connecticut, to buy, sell, repair and manufacture aeroplanes and aeroplane material and to develop commercial aeronautics. The lessee maintains the leased property as an airport; that is, as a place where aircraft take off and land, including a flying field and operations incident thereto. This airport is known as Whittall Field. It invites and receives aircraft from various places. It stores, houses and conditions such aircraft. It maintains and operates aircraft and thereby carries passengers from one point to another both within and without this Commonwealth, and also takes passengers up for short flights. It sells aircraft, sometimes making delivery by flying the planes from the factory where made, in Ohio, to its airport. The other defendants own or operate aircraft. The portion of the premises of the plaintiffs abutting on the airport is substantially forty-five feet below its surface. Their land rises to a height even above that of the airport and their residence is at about the same elevation as the airport. During the time involved in the present proceeding, the aircraft owned and operated by the defendants have been of but two types, one a biplane with a motor rated at ninety horse power, and the other a monoplane with a motor rated at two hundred and twenty horse power. All the aircraft of the defendants are and have been properly licensed and flown in accordance with regulations of both State and Federal authorities. Velocity of the wind and the load carried affect the speed and climbing rate of airplanes. After reciting conducing facts, the master finds that, considering all the circumstances, this site was reasonable and proper for a flying field and that it has been properly maintained and reasonably conducted as an airport.

With particular reference to alleged acts of trespass and nuisance, it is found that wind direction is a most important factor and that, in view of detailed findings on this point, it is apparent that a large proportion of these flights from this airport have been and under existing conditions

must continue to be made over the land of the plaintiffs. in future utilization of the flying field.

"All the defendants, with the exception of the Worcester Airport, Inc., admit flying over the plaintiffs' land. They admit flights made over the plaintiffs' house and other adjacent buildings at high altitudes. They admit flights in take-off and landing at low altitudes over that portion of the plaintiffs' premises immediately adjoining or near to the flying field, but deny such flights at low altitude over the plaintiffs' house and other buildings. The plaintiffs assert that the defendants have no right to fly their aircraft through the air space above their premises or any part thereof at any height, and especially to fly at low altitudes. How often the defendants have flown over the plaintiffs' land, and in particular over that portion within the immediate vicinity of their house and other buildings, is largely conjectural." Further findings of the master are that all of the defendants (except the Worcester Airport, Inc.) made numerous flights during 1928. "The records of the New England Aircraft Company, Incorporated, show that approximately four hundred flights were made by its aircraft from Whittall Field during the months of May, June, and up to July 18, 1928. The other defendants, exclusive of the Worcester Airport, Inc., have made numerous flights during the same period of time. On some days no flights are made from Whittall Field, and even on days when the weather is conducive to flying the number of flights vary. Generally no flights are made from this flying field on rainy and foggy days. While it is impossible to ascertain the exact number of flights made by any of the defendants over the land of the plaintiffs I find that all of the defendants, except the Worcester Airport, Inc., have flown over the plaintiffs' land whenever the condition of wind and weather has made it necessary or convenient. Except in take-offs and landings such flights have not been at low altitudes. In the take-offs and landings the flights at low altitudes have been made over that portion of the plaintiffs' premises that do not lie within the immediate vicinity of their house and other buildings. Limited to take-offs and landings I find the

several defendants who have flown from Whittall Field have made flights over the plaintiffs' premises at altitudes as low as one hundred feet. The altitude attained on any given flight depends on the distance from the point of take-off to the point from which the altitude is measured as affected by wind direction and velocity, in addition to the load of the plane. Since the establishment of this airport, except in one or two instances, flights at altitudes less than five hundred feet have not been made directly over the plaintiffs' land within the immediate vicinity of their house and buildings. Circumstances, however, may hereafter compel such flights, occasioned through compliance with regulations governing the navigation of aircraft or other unforeseen events over which the aviator has no control. In fact the very nature of the plaintiffs' premises, covered as they are by a thick growth of wood and brush, makes flights of aircraft thereover, except in take-offs and landings and at high altitudes, hazardous. In May, 1928, the defendants first learned of the plaintiffs' objection to their operation and use of the flying field. Since that time the several defendants who own and operate aircraft have endeavored so far as practicable, to refrain from flying within immediate proximity to the plaintiffs' house even at high altitudes. This case contains no element of flights made by the defendants at any time over the plaintiffs' premises with an intent to annoy. The noise from planes flying over the plaintiffs' land does not materially interfere with their physical comfort. There was no evidence in this case that either the plaintiffs, their guests or any member of their household had suffered from fear or fright by reason of airplane flights over their land. There was no evidence of damage occasioned to their property, nor interference with the present use made of their land. I find the plaintiffs are persons accustomed to a rather luxurious habit of living, and while the noise from the airplanes in flight over their premises has caused them irritation and annoyance, yet gauged by the standards of ordinary people this noise is not of sufficient frequency, duration or intensity to constitute a nuisance. There is no evidence in this case that

the defendants or any of them have conducted themselves in an unlawful or unreasonable manner, unless those defendants who have flown airplanes from Whittall Field over the plaintiffs' premises in the manner which I have described herein, have, by so doing, committed acts of trespass."

I.   Apart from the circumstance that aircraft have been operated vertically above land of the plaintiffs, it is plain under our decisions that upon the findings of the master there is no sound ground for injunctive relief on the theory that the acts of the defendants constitute a nuisance.   The law affords no rigid rule to be used as a test in all instances of alleged nuisance.   It is elastic.   It requires only that which is fair and reasonable in all the circumstances.   The noise, proximity and number of the aircraft have not been such in the case at bar as to be harmful to the health or comfort of ordinary people.   Fright and apprehension of personal danger or of injury to live stock or property are not present.   *Stevens* v. *Rockport Granite Co.* 216 Mass. 486, and cases there collected.   *Strachan* v. *Beacon Oil Co.* 251 Mass. 479, and cases cited.   We do not understand the plaintiffs to contend to the contrary at this time.

The plaintiffs expressly confine their argument to the "question of trespass and the nuisance resulting from its continuance."   No actual or possible conflict between State and Federal control of airspace has been argued. See *Commonwealth* v. *Nickerson,* 236 Mass. 281, 292–301. No discussion touching that matter is required.   No inquiry as to general or absolute liability for injuries to person or property due to the lawful or illegal operation of aircraft whether arising from negligence, accident or otherwise, is involved in the case at bar.   See *Guille* v. *Swan,* 19 Johns. 381.   The case has been presented solely on the ground of trespass and the nuisance resulting from its continuance.   No other questions will be considered.   The plaintiffs rest mainly on this proposition: "The air space which is now used or may in the future be used in the development of the underlying land is the private property of the landowner, in which he is entitled to the exclusive use and control."   They further define and limit

their contentions in support of this proposition in these words: "This right to usable air space is a vested right. It has been recognized in the past by the old Latin maxim of *cujus est solum ejus est usque ad coelum.* It is not, however, the purpose of the plaintiffs in the present case to base their contention upon this maxim. The plaintiffs' argument is based solely upon the facts found in *this case* by the master, *i.e.,* continuous flights of the defendants between the heights of one hundred and one thousand feet."

The court take judicial notice of facts of common knowledge concerning navigation of the air. In the present state of the art it is impossible to confine flight to the space over existing public ways. Aircraft and navigation of the air have become of great importance to the land and naval forces of the United States, in the carrying of mails, in forest preservation and fire prevention, and in commerce as a means of transportation of persons and commodities. Statutes touching subjects of this nature have been enacted by Congress and by the Legislatures of many of the States. Aerial navigation has been regulated to a greater or less extent by foreign governments. It has been widely discussed in relation to the municipal law and the law of persons and property of our own country, and to international law.

The earliest statute in this Commonwealth regulating the use of aircraft was St. 1913, c. 663. Later enactments are St. 1919, c. 306; G. L. c. 90, §§ 35–43; St. 1922, c. 534, and St. 1925, c. 189. By § 55 inserted in G. L. c. 90 by St. 1922, c. 534, § 1, in effect during the acts here complained of, it was provided that aircraft should not be operated "over any thickly settled or business district at an altitude of less than three thousand feet, or over any building or person at an altitude of less than five hundred feet, except when necessary for the purpose of embarking or landing." It is provided by St. 1928, c. 388, § 10 (which became effective after the present suit was instituted), amending said § 55, that "No pilot shall operate an aircraft over any thickly settled or business district except at a height sufficient to permit of a reasonably

safe emergency landing.  Such height in no case shall be less than one thousand feet, except when necessary for the purpose of embarking or landing."  By the "Air Commerce Act of 1926," 44 U. S. Sts. at Large, Part 2, 568, c. 344, the Congress of the United States enacted a statute designed in part to encourage and regulate the use of aircraft in commerce.  By § 10 it there was provided that, "As used in this Act, the term 'navigable airspace' means airspace above the minimum safe altitudes of flight prescribed by the Secretary of Commerce under section 3, and such navigable airspace shall be subject to a public right of freedom of interstate and foreign air navigation in conformity with the requirements of this Act."  Pursuant to authority conferred by § 3 of that act, the Secretary of Commerce has promulgated rules wherein it is provided by § 74: "Flying Rules. . . . (G) Height over congested and other areas. — Exclusive of taking off from or landing on an established landing field, airport, or on property designated for that purpose by the owner . . . aircraft shall not be flown — (1) Over the congested parts of cities, towns, or settlements, except at a height sufficient to permit of a reasonably safe emergency landing, which in no case shall be less than 1,000 feet.  (2) Elsewhere at height less than 500 feet, except where indispensible to an industrial flying operation."

The issuance of regulations by the Secretary of Commerce may be authorized by Congress and, so far as not violative of constitutional rights, such regulations have the force of law.  *United States* v. *Grimaud,* 220 U. S. 506.  *McKinley* v. *United States,* 249 U. S. 397.  *Avent* v. *United States,* 266 U. S. 127.  *United States* v. *Michigan Portland Cement Co.* 270 U. S. 521, 525.  *Commonwealth* v. *Slocum,* 230 Mass. 180.  Both State and Federal statutes contain provisions for the inspection and registration of aircraft and regulating and licensing of pilots to operate aircraft based upon qualification.

These statutes and regulations recognize the existence of navigation of the air as an established condition.  They do not create such navigation.  They do not authorize the

taking of private rights to promote such navigation. See now St. 1928, c. 350; G. L. c. 40, § 14, as amended by St. 1925, c. 272, as to airports. The assumption underlies their terms that navigation of the air exists and requires regulation in the interest of the public welfare.

The act of Congress and the statutes of this Commonwealth by plain implication, if not by express terms, not only recognize the existence of air navigation but authorize the flying of aircraft over privately owned land. The public nature of certain landing places for aircraft is recognized by § 57 inserted in G. L. c. 90, by St. 1922, c. 534, as amended by St. 1928, c. 388, § 11. It is essential to the safety of sovereign States that they possess jurisdiction to control the airspace above their territories. It seems to us to rest on the obvious practical necessity of self-protection. Every government completely sovereign in character must possess power to prevent from entering its confines those whom it determines to be undesirable. That power extends to the exclusion from the air of all hostile persons or demonstrations, and to the regulation of passage through the air of all persons in the interests of the public welfare and the safety of those on the face of the earth. This jurisdiction was vested in this Commonwealth when it became a sovereign State on its separation from Great Britain. So far as concerns interstate commerce, postal service and some other matters, jurisdiction over the regulation of passage through the air in large part was surrendered to the United States by the adoption of the Federal Constitution. Constitution of the United States, art. 1, § 8. It is not necessary to enter into any discussion of the theoretical or philosophical grounds upon which such jurisdiction over airspace may be supported, since it is not disputed in the case at bar. The only contention relates to the altitude of such flight in the air.

Whatever may be the precise technical rights of the landowner to the airspace above his land, the possibility of his actual occupation and separate enjoyment of it as a feasible accomplishment has through all periods of private ownership of land been extremely limited. Modern en-

gineering and construction have much increased the height to which structures may be built. The plaintiffs insert in their brief a statement of such structures including Eiffel Tower in Paris, one thousand feet in height, and several business buildings in New York respectively eight hundred eight, seven hundred ninety-two, seven hundred, six hundred twenty-five and six hundred twelve feet in height. Doubtless, in the absence of controlling police regulation, one may erect a structure upon his land as high as he desires and is able. There is nothing in the legislation to which reference has been made to limit in any way the rights of the landowner in this particular, or to restrict the height of buildings and other structures. The aircraft statutes regulate merely the minimum altitude of flight in air navigation without interference with structures upon land, and not the use of his property by the landowner.

For the purposes of this decision we assume that private ownership of airspace extends to all reasonable heights above the underlying land. It would be vain to treat property in airspace upon the same footing as property which can be seized, touched, occupied, handled, cultivated, built upon and utilized in its every feature. The experience of mankind, although not necessarily a limitation upon rights, is the basis upon which airspace must be regarded. Legislation with respect to it may rest upon that experience.

The statutes of this Commonwealth regulating the operation of aircraft manifestly were enacted under the police power. As was said by Chief Justice Knowlton in *Commonwealth* v. *Strauss*, 191 Mass. 545, 550, "The nature of the police power and its extent, as applied to conceivable cases, cannot easily be stated with exactness. It includes the right to legislate in the interest of the public health, the public safety and the public morals. If the power is to be held within the limits of the field thus defined, the words should be interpreted broadly and liberally. If we are to include in the definition, as many judges have done, the right to legislate for the public welfare, this term should be defined with some strictness, so as not to include every-

thing that might be enacted on grounds of mere expediency." It is the proper function of the legislative department of government in the exercise of the police power to consider the problems and risks that arise from the use of new inventions and endeavor to adjust private rights and harmonize conflicting interests by comprehensive statutes for the public welfare. *Commonwealth* v. *Kingsbury,* 199 Mass. 542, 544. Even with the utmost reasonable assumption as to the private rights in airspace of the owner of the underlying land, the provisions of St. 1922, c. 534, constitute valid regulations of the flight of aircraft in airspace actually unoccupied by the owner of the underlying land. There are numerous analogies where the invasion of the airspace over underlying land by noise, smoke, vibration, dust and disagreeable odors, having been authorized by the legislative department of government and not being in effect a condemnation of the property although in some measure depreciating its market value, must be borne by the landowner without compensation or remedy. Legislative sanction makes that lawful which otherwise might be a nuisance. Examples of this are damages to adjacent land arising from smoke, vibration and noise in the operation of a railroad, *Presbrey* v. *Old Colony & Newport Railway,* 103 Mass. 1, 6, 7; *Wellington* v. *Boston & Maine Railroad,* 158 Mass. 185, 189; *Saltonstall* v. *New York Central Railroad,* 237 Mass. 391, 398, 399; *Richards* v. *Washington Terminal Co.* 233 U. S. 546, 554, 555; the noise of ringing factory bells, *Sawyer* v. *Davis,* 136 Mass. 239, 242, and cases cited; the abatement of nuisances, *Bancroft* v. *Cambridge,* 126 Mass. 438; the erection of steam engines and furnaces, *Call* v. *Allen,* 1 Allen, 137; unpleasant odors connected with sewers, oil refining and storage of naphtha, *Taft* v. *Commonwealth,* 158 Mass. 526, 548; *Titus* v. *Boston,* 161 Mass. 209; *Lincoln* v. *Commonwealth,* 164 Mass. 368, 377; *Strachan* v. *Beacon Oil Co.* 251 Mass. 479; *St. James Building Corp.* v. *Commissioner of Public Safety,* 260 Mass. 548, 554–555; the smelting of iron, *Murtha* v. *Lovewell,* 166 Mass. 391, 393; and maintaining bowling alleys, *Levin* v. *Goodwin,* 191 Mass.

341. See, also, *Campbell v. United States*, 266 U. S. 368, 372. The mill acts in certain aspects authorize a direct invasion of private rights in real estate. Notwithstanding such invasion they are sustained, not as an exercise of the power of eminent domain but as a regulation under the police power of private rights in the waters of a flowing stream not otherwise susceptible of valuable use. *Lowell v. Boston*, 111 Mass. 454, 464–467. *Blackstone Manuf. Co. v. Blackstone*, 200 Mass. 82, 88. *Duncan v. New England Power Co.* 250 Mass. 228. *Dickinson v. New England Power Co.* 257 Mass. 108. *Pacific Live Stock Co. v. Lewis*, 241 U. S. 440, 448, 449. On the same principle, statutes authorizing the flowing of land for the cultivation of cranberries and for the culture of useful fishes have been sustained. *Turner v. Nye*, 154 Mass. 579. There are numerous statutes upheld as an exercise of the police power interfering with, narrowing and regulating, private rights of landowners in the use of their estates. There are many illustrations of the exercise of this power: rights of fishery in nonnavigable streams, *Commonwealth v. Alger*, 7 Cush. 53, 84, 85, 97–102; the establishment of fire districts and regulation of the material and method of construction of buildings, *Commonwealth v. Atlas*, 244 Mass. 78, 82, and cases collected; *Stevens, landowner*, 228 Mass. 368; requirements for the installation of sprinklers, *Commonwealth v. Badger*, 243 Mass. 137; creation for construction of buildings of set-back lines from streets, *Slack v. Inspector of Buildings of Wellesley*, 262 Mass. 404; prohibition of fences above a limited height, *Rideout v. Knox*, 148 Mass. 368; regulation of height of buildings, *Welch v. Swasey*, 193 Mass. 364, affirmed 214 U. S. 91; and the establishing of zoning districts restricting the use of land in defined territories, *Inspector of Buildings of Lowell v. Stoklosa*, 250 Mass. 52; *Euclid v. Ambler Realty Co.* 272 U. S. 365. Numerous cases upholding statutes of this general nature are collected and reviewed in *Opinion of the Justices*, 234 Mass. 597, and need not again be analyzed. There are other instances of limitation of the right of absolute ownership, without special statute, in the law of passing over prop-

erty of private landowners in the exercise of a general right, as, for example, access to great ponds for fishing and fowling, *West Roxbury* v. *Stoddard*, 7 Allen, 158, 166; *Slater* v. *Gunn*, 170 Mass. 509, 514; right of travellers when highway is blocked, *Campbell* v. *Race*, 7 Cush. 408, and in some western States to graze live stock on unfenced private land, *Buford* v. *Houtz*, 133 U. S. 320; *MacKay* v. *Uinta Development Co*. 135 C. C. A. 18. An extreme instance of regulation of private ownership was the act of Congress forbidding the ejectment by a landlord of a tenant who desired to remain at the former rental or such rental as was fixed by a commission, the validity of which was upheld as an emergency measure in *Block* v. *Hirsh*, 256 U. S. 135.

None of these decisions are precise authorities in support of the view that the regulations found in St. 1922, c. 534, and its amendments, as to flight by aircraft in upper airspaces, are valid as against the owner of the underlying land. The principles there declared require the conclusion that such flight by aircraft within the limits disclosed on this record is lawful against the protest of the owner of the underlying land. It is to be observed that in the case at bar there has been no harm to the landowners. There have not been flights by excessive numbers of aircraft. The light of the sun has not been obscured and the land has not been shadowed. No airlane of through travel has been established over their land. Nothing has been thrown or fallen from the aircraft upon the underlying ground. There have been no noxious gases or fumes. There has been no other interference with any valuable use of which the land of the plaintiffs is capable. The case at bar is radically different from *Hakkila* v. *Old Colony Broken Stone & Concrete Co*. 264 Mass. 447, where there was direct physical impact on land.

All that has been said hitherto has reference to five hundred feet as the minimum altitude of general flight over land like that of the plaintiffs permissible under § 55, added to G. L. c. 90 by St. 1922, c. 534, § 1, now made one thousand feet as amended by St. 1928, c. 388, § 10.

It is equally pertinent to the same minimum height of five hundred feet permissible under § 74 (G) (1) (2) of the regulations of the Secretary of Commerce. The power of the Federal government over interstate commerce is as extensive as that of this Commonwealth under the police power with respect to regulation of height of flight of aircraft in such commerce. The United States exercises the police power within the field of interstate commerce. *Lottery Case,* 188 U. S. 321. *Brooks* v. *United States,* 267 U. S. 432, 436, 437. It is to be remembered in this connection that there is nothing in any of the controlling statutes or regulations which in any measure prevents the plaintiffs from making any actual use they choose of the airspace above five hundred feet in altitude.

So far as concerns property of the plaintiffs the regulation of five hundred feet as the minimum altitude of flight by aircraft cannot rightly in our opinion be pronounced to be in excess of the permissible interference under the police power and under regulation of interstate commerce with rights of the plaintiffs in the airspace above that height over their land.

The one or two instances of flights at less than five hundred feet over land of the plaintiffs and the possibility of similar flights in the future, as set out by the master and already narrated, are not sufficient to require or warrant injunctive relief. The injury thus done to and the interference with any and all valuable use of the property of the plaintiffs are not certain and substantial but rather are slight and theoretical. There has been no physical contact with property of the plaintiffs in actual use or practicably usable. *Downing* v. *Elliott,* 182 Mass. 28.

II. The several defendants, except the Worcester Airport, Inc., in take-offs and landings have made flights over real estate of the plaintiffs at altitudes as low as one hundred feet. In degree these flights approach much more closely to an interference with rightful enjoyment of land than do flights at the minimum altitude permissible for general travel by aircraft. The sections of the statutes already referred to as to minimum altitude of flight by air-

craft make exception in favor of lower but unspecified alti-
tudes in embarking or taking off from, and landing on,
the surface of the earth.  Those exceptions are manifestly
necessary in order to protect the pilot from charges of
violation of law.  There is no regulation fixing in express
terms the altitude of flight by aircraft in taking off from
or landing at airports or other places.  The exceptions from
minimum altitude of ordinary flight in favor of lower but
unspecified altitude in taking off and landing do not seem
to us to be intended as legislative limitations upon the
rights of landowners in the airspace.  Otherwise they might
authorize flight so near the surface of the land as to con-
stitute unquestionable interference with the rights of the
landowner.  These legislative exceptions have ample scope
for their operation in respect to conduct of pilots and general
public safety.  It would be a strained and unnatural con-
struction to interpret them as designed to authorize inter-
ference with recognized property rights.  Manifestly it is
essential to navigation of airspace that there be airports for
the accommodation of aircraft, not only by storage but by
replenishment of fuel and other necessary mechanical atten-
tion.  Provision is made for certain landing places for air-
craft by § 57, added to G. L. c. 90 by St. 1922, c. 534, § 1.
See St. 1928, c. 388, § 11, and c. 350.

It has been urged in argument that the public have the
same right of passage through airspace, even at the low
altitudes and under conditions necessary in taking off and
landing, that exists with reference to access to the sea for
navigation, fishing and fowling over the space between high
and low water mark not exceeding one hundred rods in
width.  That right and the right here claimed by the de-
fendants are not alike.  That right of passage over the fore-
shore was an original legislative reservation out of a grant
from the colony.  The title of the owner of the upland was
at all times subject to that reservation.  *Commonwealth* v.
*Alger*, 7 Cush. 53, 90.  *Butler* v. *Attorney General*, 195 Mass.
79.  *Jubilee Yacht Club* v. *Gulf Refining Co.* 245 Mass. 60,
63.  The same principle applies to rights of navigation in
navigable rivers.  *Home for Aged Women* v. *Commonwealth*,

202 Mass. 422, 433, 434. No question is presented on this record touching legislation by the Congress as to the establishment of an airport and the grant of access to and egress from it through the air, all in the general interest of interstate commerce or aerial navigation. Therefore it is unnecessary to discuss cases like *Gibson* v. *United States*, 166 U. S. 269; *Scranton* v. *Wheeler*, 179 U. S. 141; *Bedford* v. *United States*, 192 U. S. 217; *Jackson* v. *United States*, 230 U. S. 1; *Bothwell* v. *United States*, 254 U. S. 231, and *Keokuk & Hamilton Bridge Co.* v. *United States*, 260 U. S. 125, where the Federal government in the exercise of its power over navigation has caused actual injury to private rights which was held to be without redress. Compare *Phelps* v. *United States*, 274 U. S. 341, 343. The airport here involved appears to be privately owned and not to possess any attributes of a strictly public nature. It does not differ from any other commercial adventure inviting the patronage of the public. Seemingly it was a proper airport for resort by aircraft. It was not established or licensed or expressly authorized by public authority. It has been said that "the Legislature may authorize small nuisances without compensation, but not great ones." *Bacon* v. *Boston*, 154 Mass. 100, 102. But the airport and its use as disclosed on this record do not rest under the shelter of express legislative sanction. So far as we are aware, there is no regulation as to the minimum area of an airport. Aerial navigation, important as it may be, has no inherent superiority over the landowner where their rights and claims are in actual conflict.

The bald question in the case at bar is whether aircraft, in order to reach or leave an airport, may of right fly so low as one hundred feet over brush and woodland not otherwise utilized, against the protest of the owner. Suggestions as to flight of carrier pigeons and the practice of falconry over private lands seem to us too remote and distinct from the mechanical flights of high powered aircraft to be helpful in ascertainment of rights in the case at bar. There are numerous cases holding that invasion of the airspace above the land without contact with its surface constitutes trespass. For example, projecting eaves of a

building, *Harrington* v. *McCarthy*, 169 Mass. 492; *Smith* v. *Smith*, 110 Mass. 302, 303, 304; cornices, *Wilmarth* v. *Woodcock*, 58 Mich. 482; *Lawrence* v. *Hough*, 8 Stew. (N. J.) 371; roofs, *Murphy* v. *Bolger Brothers*, 60 Vt. 723; leaning walls, *Barnes* v. *Berendes*, 139 Cal. 32; wire strung over land twenty or thirty feet above the surface, *Butler* v. *Frontier Telephone Co.* 186 N. Y. 486; thrusting one's arm into the space over a neighbor's land, *Hannabalson* v. *Sessions*, 116 Iowa, 457; a horse kicking into such space, *Ellis* v. *Loftus Iron Co.* L. R. 10 C. P. 10; a board or other structure projecting over land of another, *Puorto* v. *Chieppa*, 78 Conn. 401; *Norwalk Heating & Lighting Co.* v. *Vernam*, 75 Conn. 662; shooting over another's land, *Whittaker* v. *Stangvick*, 100 Minn. 386; *Herrin* v. *Sutherland*, 74 Mont. 587, 597, 598; *Portsmouth Harbor Land & Hotel Co.* v. *United States*, 260 U. S. 327, have all been held to constitute acts of trespass. In discussing this subject it is said in Pollock on Torts, (13th ed.) 362: "It does not seem possible on the principles of the common law to assign any reason why an entry above the surface should not also be a trespass, unless indeed it can be said that the scope of possible trespass is limited by that of possible effective possession, which might be the most reasonable rule." Even if this suggestion of extreme limit be adopted as the test, namely, that "the scope of possible trespass is limited by that of possible effective possession," the plaintiffs seem entitled to assert that there have been trespasses upon their land. It is general knowledge that, while not extremely common in this vicinity, trees not infrequently reach heights in growth considerably in excess of one hundred feet. In other parts of the country there are trees of much greater height. It is found by the master that the plaintiffs have undertaken to reforest a part of their estate by planting Norway pine and spruce. It is well known that buildings in many cities exceed one hundred feet in height. Not infrequently they reach three hundred feet or even more. The test suggested is not actual but possible effective possession. It is not decisive that the plaintiffs do not at the present make that

possible effective possession a realized occupation. They complain of invasion of property rights. The noise of aircraft in flight at an altitude of less than two hundred feet (as found by the master) was neither of great intensity nor of lasting duration and was less and shorter than that occasioned by the passing of the ordinary motor truck. Other than this there is nothing in the master's report differentiating in detail with respect to the annoyance and actual effect of the flights of aircraft at altitudes between one hundred and five hundred feet. It is not necessary to make any decision touching that matter. The facts show intrusion upon the land of the plaintiffs by flight of aircraft at these low altitudes by noise and by the presence of the aircraft and its occupants. These interferences create in the ordinary mind a sense of infringement of property rights which cannot be minimized or effaced. It would be impracticable to draw a feasible distinction as matter of right between the aircraft used by the defendants and aircraft of larger size, heavier weight and more powerful motors, and between the number and extent of use of the aircraft here involved and the much larger number and more extensive use incident to growth of air navigation.

The combination of all these factors seems to us, under settled principles of law, after making every reasonable legal concession to air navigation as commonly understood and as established under the statutes and regulations here disclosed, to constitute trespass to the land of the plaintiffs so far as concerns the take-offs and landings at low altitudes and flights thus made over the land of the plaintiffs "at altitudes as low as one hundred feet." Air navigation, important as it is, cannot rightly levy toll upon the legal rights of others for its successful prosecution. No reason has been suggested why airports of sufficient area may not be provided so that take-offs and landings of aircraft may be made without trespass upon the land of others. If, in the interest of aerial navigation, rights of flight at such low altitude over lands of others are of sufficient public importance, doubtless the power of eminent domain for acquisition of rights of way in airspaces might

be authorized. *Old South Association* v. *Codman,* 211 Mass. 211, 215, 216. See St. 1902, c. 534, § 6; *Boston* v. *Talbot,* 206 Mass. 82, 88. However that may be, we can only apply the law as it is to this case as presented.

We do not decide whether or to what extent flight by aircraft over private land at a lower altitude than five hundred feet may be authorized in the exercise of the police power. As already pointed out, existing statutes and regulations do not go to that extent.

III. The final point to be determined is whether the circumstances are such as to require injunctive relief. Upon that point the nature of the trespasses shown is important. Although there appear to have been a considerable number of trespasses by aircraft, it seems plain that they are not in the same place as to linear space or altitude. In the nature of things the flights of aircraft must vary with wind and load. No prescriptive right to any particular way of passage could be acquired in these conditions. *Jones* v. *Percival,* 5 Pick. 485. *Starkie* v. *Richmond,* 155 Mass. 188, 196. *Hoyt* v. *Kennedy,* 170 Mass. 54, 56. The finding of the master is express to the effect that the plaintiffs have not shown that they have sustained any damage to their property or its use, or have suffered material discomfort. The kind of land upon which the trespass is committed is also an important factor. As already stated, that of the plaintiffs affected by flights at low altitudes is covered with dense brush and woods. It is uncultivated. It does not appear that any valuable use is made of it either for pleasure or profit. That might not be a factor of consequence in an action at law for the assessment of damages. See *C. W. Hunt Co.* v. *Boston Elevated Railway,* 199 Mass. 220, 236–237. But it is a factor to be taken into account with all the others in determining whether injunctive relief ought to be afforded. In view of all these conditions, injunctive relief is not granted. *Downing* v. *Elliott,* 182 Mass. 28. *Wade* v. *Miller,* 188 Mass. 6. *Atkins* v. *Chilson,* 7 Met. 398, 405. *Browne* v. *Niles,* 165 Mass. 276, 279. *Levi* v. *Worcester Consolidated Street Railway,* 193 Mass. 116. *Llandudno Urban District Council* v. *Woods,* [1899] 2 Ch. 705. See

*Stratton* v. *Mount Hermon Boys' School*, 216 Mass. 83, 87, 88; *Bassett* v. *Salisbury Manuf. Co.* 47 N. H. 426, 436, 437; *McCann* v. *Chasm Power Co.* 211 N. Y. 301.

Whether the case should have been retained for assessment of damages rested in the sound judicial discretion of the trial judge. That was exercised against the plaintiffs and presents no error of law. At most upon this record there could have been nothing more than nominal damages. *Newburyport Institution for Savings* v. *Puffer*, 201 Mass. 41, 47, 48. *Booras* v. *Logan*, 266 Mass. 172, 175. *Florimond Realty Co. Inc.* v. *Waye*, 268 Mass. 475, 478.

IV. The plaintiffs contend that the effect of St. 1922, c. 534, and of the "Air Commerce Act of 1926" and the regulations of the Secretary of Commerce thereunder, as construed herein, and of this decision is to deprive them of property without due process of law contrary to the provisions of the Constitution of this Commonwealth and of the Fifth and Fourteenth amendments to the Constitution of the United States. It is assumed that the Congress in legislating concerning interstate commerce is bound by the Fifth Amendment to the Federal Constitution. *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312, 336. The only authorities cited by the plaintiffs in support of their contention are the Monongahela Navigation Company case and *United States* v. *Lynah*, 188 U. S. 445. Those two decisions in our opinion afford no support to the contention of the plaintiffs. In their facts they bear no resemblance to the case at bar. As already pointed out these statutes and regulations have been enacted under the police power and in regulation of interstate commerce. For the reasons stated in division I of this opinion and on the authority of the numerous cases there cited we think that no constitutional right of the plaintiffs has been infringed. Our own decisions already reviewed are decisive against the impairment of any constitutional rights of the plaintiffs. In addition to the Federal decisions already cited there are numerous others which appear to us to support the conclusions here reached. *Fischer* v. *St. Louis*, 194 U. S. 361. *California Reduction Co.* v. *Sanitary Reduction Works*, 199

U. S. 306. *Manigault* v. *Springs,* 199 U. S. 473. *Bacon* v. *Walker,* 204 U. S. 311. *Reinman* v. *Little Rock,* 237 U. S. 171. *Hadacheck* v. *Sebastian,* 239 U. S. 394. *Jacob Ruppert* v. *Caffey,* 251 U. S. 264, 303. Whether decisions like *Scranton* v. *Wheeler,* 179 U. S. 141, *Jackson* v. *United States,* 230 U. S. 1, *Keokuk & Hamilton Bridge Co.* v. *United States,* 260 U. S. 125, touching the power of Congress over navigable waters, are applicable to navigation of the air may be doubted. But in the view that we take of the case at bar it is not necessary to decide that point. This decision rests on the valid exercise of the police power of the General Court so far as concerns the Constitution of this Commonwealth and the Fourteenth Amendment to the Federal Constitution and on the valid exercise of the power of the Congress over interstate commerce so far as concerns the Fifth Amendment to the Federal Constitution.

V. The plaintiffs ask for a revision of the final decree so far as it awards costs against them. The only thing in the final decree touching costs is this: "the plaintiffs are hereby directed to pay the defendants costs amounting to $616.50." The parties have argued this branch of the case on the theory that there is open now for consideration the question whether an item of $580.25, "one half of the cost of the stenographic report of evidence before the master," paid by the defendants, rightly was included in the costs ordered to be paid to them by the plaintiffs. The point is considered and decided on the footing on which it has been presented.

It appears from the record that the order appointing the master contained a clause requiring him to "report the evidence." This is an unusual provision to insert in an order appointing a master. It implies under present conditions that he must be attended by a stenographer to the end that the evidence may be reported. This controversy does not concern the payment of such stenographer pursuant to the order appointing the master. It is fairly inferable from the arguments and from the record, no finding having been made by the judge, that the evidence before the master was taken stenographically and that at

least two copies of it were typewritten, of which each party had one. Perhaps a third copy was prepared for the master. Thus the only matter for decision is whether the court had power to order this item of expense, paid by the defendants, to be taxed as a part of their costs against the plaintiffs. No statute has been brought to our attention, and we are not aware of any, which authorizes the taxation of such expenses as costs. The items of costs are fixed with some particularity by G. L. c. 261, but do not include any of this nature. It is not justified by any established practice. Expenses of this nature commonly have been shared by the parties. The subject of costs is discussed somewhat at large in *Fuller* v. *Trustees of Deerfield Academy*, 252 Mass. 258, with a review of cases. It is apparent from that decision that allowance of this item of costs was not permissible. It follows that the final decree is reversed. Decree is to be entered dismissing the bill with costs to be taxed in favor of the defendants against the plaintiffs in the usual way.

*Ordered accordingly.*