WARREN TOWNSHIP SCHOOL DISTRICT NO. 7, MACOMB COUNTY, *v.* CITY OF DETROIT.
AGAR *v.* SAME.

1. INJUNCTION—NUISANCE—PROPOSED USE OF NEARBY PROPERTY—EVIDENCE.
    A plaintiff who merely shows that defendant's proposed use of nearby property may constitute a possible threatened nuisance is not entitled to an injunction.

2. SAME—NUISANCE—LACHES—ACQUISITION OF AIRPORT.
    City, in condemning a square mile of territory in adjoining township for use as an airport, may not raise defense of laches in subsequent suit by owners of surrounding land to enjoin

operation of the tract as an airport in the event that it becomes a nuisance where such neighbors have sought unsuccessfully to enjoin such use of the land while it was being acquired.

3. TRESPASS—FLIGHT THROUGH AIR—COMMON-LAW MAXIM.

The old maxim that he who owns the soil has it even to the sky and to the lowest depths no longer applies to the use of the atmosphere for flight purposes at a height which does not materially interfere with the free use and enjoyment of the land below (1 Comp. Laws 1929, §§ 4813, 4814).

4. EASEMENTS—FLIGHT—OWNERSHIP OF SURFACE—STATUTES.

The ownership of the space above the lands and waters of this State is declared by statute to be in the several owners of the surface underneath subject to the right of flight by aircraft unless at such low altitudes as to interfere with the then existing use to which the land or water is put by the owner or as to be dangerous to persons or property lawfully on the surface beneath (1 Comp. Laws 1929, §§ 4813, 4814).

5. TRESPASS—FLIGHT—PRIVILEGE.

An entry above the surface of the earth, in the air space in the possession of another, by a person who is traveling in an aircraft, is privileged if the flight is conducted (a) for the purpose of travel through the air space or for any other legitimate purpose, (b) in a reasonable manner, (c) at such a height as not to interfere unreasonably with the possessor's enjoyment of the surface of the earth and the air space above it, and (d) in conformity with such regulations of the State and Federal aeronautical authorities in force in the particular State.

6. SAME—FLIGHT AT LOW HEIGHT—PRIVILEGE—CAUSING INJURY OR FRIGHT TO OCCUPANTS UNDERNEATH.

A flight conducted at such a low height as to cause reasonable fear or substantial annoyance to occupants of land underneath or so as to frighten cattle or other animals thereon in such a way as to cause them harm or to endanger the surface of the land, or persons, trees, structures or other things thereon, or to interfere with the possessor's legitimate use of the air space, is not a privileged flight.

7. NUISANCES—AIRPORTS.

An airport is not a nuisance *per se* although it might become such from the manner of its construction or operation.

8. INJUNCTION—FALLING OF PLANES.

Mere apprehension of injury from the falling of planes is not sufficient to authorize an injunction against aerial navigation over the property of a complainant.

9. CONSTITUTIONAL LAW—ESTABLISHMENT OF A LAWFUL BUSINESS—USE OF PROPERTY—AIRPORTS.

Aviation is a lawful business and the owner of real estate has the right to establish an airport thereon if it is properly located and properly operated notwithstanding for aesthetic and sentimental reasons it may not be agreeable to persons owning fine country homes in the community.

10. INJUNCTION—ESTABLISHMENT OF AIRPORT—DECREASE IN VALUE.

Decrease in value of adjoining property is not, alone, sufficient to base injunction against establishment of an airport, since, although it may be less desirable for the use to which now put, it may increase in value for other purposes.

11. NUISANCES—AIRPORTS—CONTINUING TRESPASS.

Although an airport is not a nuisance *per se*, it may become a nuisance or be responsible for one if the airplanes using it cause a nuisance or a continuing trespass.

12. TRESPASS—LOW FLIGHT OF AIRCRAFT—INTERFERENCE WITH EXISTING USE.

Flight of aircraft over another's land so low as to interfere with the then-existing use, whether in landing, taking off, or otherwise, is expressly outside the statutory definition of a lawful flight, is an unprivileged intrusion in the space above the land, and constitutes a trespass (1 Comp. Laws 1929, §§ 4813, 4814).

13. NUISANCE—LOW FLIGHT OF AIRCRAFT.

Extensive flying of aircraft at low altitude, accompanied by excessive noise and occasioning unreasonable annoyance to occupants of the land below and apprehension of danger on their part, constitutes an element of nuisance in that it is substantial interference with enjoyment of the property by the occupants.

14. EVIDENCE—JUDICIAL NOTICE—SIZE OF AIRPLANES.

Judicial notice is taken of the tremendous increase in the size of airplanes during the past few years (1944).

15. EQUITY—MOTION TO DISMISS—EVIDENCE.

Pertinent, credible and uncontradicted testimony on behalf of plaintiffs is accepted as true on a motion for dismissal of bill of complaint.

16. INJUNCTION—ESTABLISHMENT OF AIRPORT—ADJOINING LAND-OWNERS—SCHOOLS—USE BY LARGE AIRPLANES—NUISANCE.

While the establishment of an airport upon a mile-square tract of land will not be enjoined at the suit of adjoining land-owners consisting of a school district, a church organization, and various private parties because of anticipated use of the airport by large planes, if such use constitutes a nuisance because planes come so close to nearby two-story schoolhouse at which over 900 pupils attend as to constitute serious inter-ference with use of school by reason of noise, light and vibra-tion, the use may be enjoined as a nuisance or a continuing trespass.

17. SAME—CONDEMNATION PROCEEDINGS—PARTIES—ESTABLISHMENT OF AIRPORT.

Owners of land, used for school and church, as well as for private uses, adjoining that being condemned by city for use as an airport, and who are not parties to the condemnation proceedings, need not become such to protect their rights, and effort to do so by way of suit to enjoin establishment of air-port was not improper.

18. EMINENT DOMAIN—PURPOSE OF CONDEMNATION PROCEEDINGS.

Condemnation proceedings are for the purpose of taking private, not public, property.

19. NUISANCE—AIRPORTS—POSSIBLE TECHNOLOGICAL DEVELOPMENTS.

In deciding whether or not a proposed mile-square airport is a nuisance *per se,* a court may not consider possible tech-nological improvements in airplanes that may enable them to land and take off in a very much smaller space and that may reduce their noise, such developments being of a specu-lative character.

20. INJUNCTION—DISMISSAL WITHOUT PREJUDICE—SUBSEQUENT NUI-SANCE—AIRPORTS.

Dismissal of adjoining landowners' bills to enjoin establish-ment of airport on square mile of land is without prejudice to the rights of any of the plaintiffs to seek injunctive or other relief in case the operation of the airport or that of airplanes landing at or taking off therefrom results in a nuisance or continuing trespass.

21. COSTS—PUBLIC QUESTION—INJUNCTION—AIRPORTS.

No costs are allowed in suit by school district, a church organ-ization, and various private persons upon dismissal of their bill to enjoin establishment of an airport upon square mile

of land adjoining or in the vicinity of plaintiffs' lands, a public question being involved (1 Comp. Laws 1929, §§ 4813, 4814).

Appeal from Macomb; George (Fred W.) J., presiding. Submitted January 7, 1944. (Docket Nos. 71, 72, Calendar Nos. 42,531, 42,532.) Decided April 3, 1944.

Separate bills by Warren Township School District No. 7, Macomb County, and William Agar and others against City of Detroit to enjoin the establishment of an airport. Bills dismissed. Plaintiffs appeal. Affirmed without prejudice to right to seek relief if operation of airport results in nuisance or continuing trespass.

*Carl J. Thrun, Benjamin S. Pagel,* and *Charles A. Retzlaff,* for plaintiffs.

*Paul E. Krause,* Corporation Counsel, *Bert R. Sogge,* Assistant Corporation Counsel, and *B. V. Nunneley,* for defendant.

BUTZEL, J. The two above-entitled causes against the city of Detroit were consolidated for hearing in the trial court and also on appeal. In the first case, Warren Township School District No. 7, Macomb county, sought an injunction to restrain condemnation proceedings brought by defendant to acquire one square mile of land situated in Macomb county and bounded on the south by Eight Mile road, the north by Nine Mile road, the east by DeQuindre road and the west by Ryan road. The land comprises one-quarter of the total area of the school district. Diagonally across from the northeast corner of the proposed site, and about 125 feet distant therefrom,

is a large modern two-story school building erected at a cost of $109,000 by the school district. Adjoining it are two grade school buildings owned by plaintiff and also a new U. S. O. building erected by the United States government at a substantial cost, the latter building being extensively used by the plaintiff for gymnasium, auditorium and social purposes. The school has an enrollment of 910 students; 27 teachers are employed; the classes begin with a kindergarten and run through the eighth grade.

In the companion case, William Agar and other individuals allege that they own and occupy homes in the vicinity of the proposed airport. The plaintiffs also include a Lutheran congregation which owns a church site near the school building. A structure on the site is already being used. The church expects to erect a larger building, also to be used for school purposes. It values the property at the present time at $12,000.

There is a tall chimney on the school grounds at least 60 feet in height, the exact dimensions not being shown by the record. Eight Mile road is the dividing line between the city of Detroit, in Wayne county, and Macomb county. It is claimed by defendant, and not denied by plaintiffs, that the present airport of the city of Detroit is inadequate and it has become necessary for the city to acquire a site for a larger one. All plaintiffs, however, claim that the building and the subsequent operation of such an airport in the immediate vicinity of their properties would destroy the use for which they were acquired and are being employed. They show that the airport, *if* used for the larger airplanes, would cause such a nuisance because of the noise, light, vibration, and general disturbances incident to the operation of such an airport and airplanes in landing and taking off that plaintiffs will be deprived of

the peaceful use and quiet enjoyment of their respective properties without due process of law. Although serious charges were made and testimony was given to substantiate them by plaintiffs, the city of Detroit offered only one witness, Brother Amian, who teaches in a school opposite the present airport in the city of Detroit, and who testified that the number of pupils at the school had increased notwithstanding the noise from the airport. The city made a timely motion to dismiss on the ground that an airport was not a nuisance *per se,* and that, therefore, its construction should not be enjoined. The motion was granted at the conclusion of plaintiffs' proofs. The city was within its rights in not offering any further testimony although plaintiffs' case showed a possible threatened nuisance to some of the plaintiffs, and particularly to the school district, if large airplanes were flown in close proximity to their respective properties.

We shall limit our discussion almost entirely to the case in which the school district is the plaintiff, as the testimony mainly covered this case. General principles laid down in this opinion are applicable to the case brought by the individual plaintiffs, if conditions they now claim are threatened should hereafter arise. Plaintiffs have undoubtedly given positive warning to the city that the airport may become a nuisance, and the charge of laches may not be brought against them should it become necessary for them to bring another action after the airport is in operation. The city proceeds at its peril. It should be mindful of the case brought against it by the Northwest Home Owners Association, *Northwest Home Owners Ass'n* v. *City of Detroit,* 298 Mich. 622, wherein we held that the conduct and operation of a garbage incinerator in a certain resi-

dential district was a nuisance and we enjoined its further use until means could be found for operating it without creating a nuisance. In a previous case, *Sommers* v. *City of Detroit,* 284 Mich. 67, we declined to enjoin the proposed construction and operation of the same garbage incinerator since it was represented at that time that it could be maintained without being a nuisance. Sometimes a war is lost, though a previous battle may have been won. It would be unfortunate indeed if the city, after spending a very large sum for an airport, should later be enjoined from using it for larger airplanes.

As many of the questions involved are presented to us for the first time in this State, we believe a discussion may be beneficial, particularly in view of the possibility of further litigation, should the occasion arise.

Until recently there was no need to question the old maxim that "he who owns the soil has it even to the sky and to the lowest depths." Latterly, however, the courts have universally recognized its fallacy when applied to the use of the atmosphere for flight purposes at a height which did not materially interfere with the free use and enjoyment of the land below. The ownership of the space above the lands and waters of this State is by statute declared to be in the several owners of the surface underneath subject to the right of flight as defined by statute. 1 Comp. Laws 1929, § 4813 (Stat. Ann. § 10.23). Flight by aircraft over the lands and waters is lawful unless at such low altitudes as to interfere with the then existing use to which the land or water is put by the owner, or unless so conducted as to be imminently dangerous to persons or property lawfully on the land or water beneath. 1 Comp. Laws 1929, § 4814 (Stat. Ann. § 10.24). Similar laws

and the right of flight over lands have already been the subject of litigation. The law is summed up in 1 Restatement, Torts, chap. 8, § 194, as follows:

"An entry above the surface of the earth, in the air space in the possession of another, by a person who is traveling in an aircraft, is privileged if the flight is conducted

"(a) for the purpose of travel through the air space or for any other legitimate purpose,

"(b) in a reasonable manner,

"(c) at such a height as not to interfere unreasonably with the possessor's enjoyment of the surface of the earth and the air space above it, and

"(d) in conformity with such regulations of the State and Federal aeronautical authorities as are in force in the particular State.　*　*　*

"Comment on Clause (c):

"g. Under the rule stated in this section, only those flights are privileged which are conducted at such a height as not unreasonably to interfere with the possessory interest in the land. Thus, a flight, although otherwise conducted in a reasonable manner, for a legitimate purpose, and in conformity with all applicable local regulations, if conducted at such a low height as to cause reasonable fear or substantial annoyance to occupants of the land or to frighten cattle or other animals thereon in such a way as to cause them harm, or to endanger the surface of the land, or persons, trees, structures or other things thereon, or to interfere with the possessor's legitimate use of the air space, is not within the privilege. As to the actor's liability if he thus invades the column of air above another's land near the surface in the course of making a forced landing, see section 159, comment g."

An illustration is given as follows:

"4. A flies in an airplane over B's house within 200 feet of the roof, thereby causing annoyance and

fear of harm to B and the other occupants of B's house. A is a trespasser."

In *Batcheller* v. *Commonwealth,* 176 Va. 109 (10 S. E. [2d] 529), quoting in part from *Thrasher* v. *City of Atlanta,* 178 Ga. 514 (173 S. E. 117, 99 A. L. R. 158, 1934 U. S. Av. 166), a case frequently cited, it was held that:

" 'An airport is not a nuisance *per se* although it might become such from the manner of its construction or operation. Mere apprehension of injury from the falling of planes is not sufficient to authorize an injunction against aerial navigation over the property of the complainant.' *  *  *

"Even if the establishment of the airport should result in a depreciation in the value of the fine residences and country homes in the community where the airport was proposed to be established, that fact afforded no reason for the denial of the permit applied for. Aviation is a lawful business and the owner of real estate has the right to establish an airport thereon if it is properly located and properly operated notwithstanding for aesthetic and sentimental reasons it may not be agreeable to persons' owning fine country homes in the community."

In *Swetland* v. *Curtiss Airports Corp.,* 41 Fed. (2d) 929, modified on other grounds in 55 Fed. (2d) 201 (83 A. L. R. 319), the court said:

"Evidence has been offered upon the issues as to whether or not the property of the plaintiffs will decrease in value if the location of the airport upon the adjoining property is not enjoined. We find it unnecessary to determine this issue, for if it be conceded that the property of the plaintiffs will decrease in value if the airport is permitted to operate, that alone would not entitle the plaintiffs to an injunction. *Hazlett* v. *Marland Refining Co.* (C. C. A.), 30 Fed. (2d) 808; 46 C. J. 682, note 25. If the

airport is not a nuisance, its operation may not be enjoined because to some extent the value of the plaintiffs' property will be decreased for the purpose to which it is now devoted. It is a matter of conjecture and speculation whether the property of the plaintiffs will increase in value for other purposes, and whether the plaintiffs will ultimately sustain actual financial loss because of the operation of the airport. It may be conceded that the property of the plaintiffs will be less desirable for the purposes of a country estate. No one will contend that the plaintiffs will have the same enjoyment of peace and quiet which they have had in this locality for nearly a quarter of a century. This they have been able to have because of the use to which the adjoining property was devoted, but they at no time had a right to prevent the adjoining owner from using this property for any reasonable purpose. They have been fortunate in that they have been able to enjoy their country estate as they have for so long a time. They must now yield to change and progress of the times.''

On the other hand, even though an airport is not a nuisance *per se,* it may become a nuisance or be responsible for one if the airplanes using it cause a nuisance or a continuing trespass.

In *Burnham* v. *Beverly Airways, Inc.,* 311 Mass. 628 (42 N. E. [2d] 575, 1942 U. S. Av. 1), the court stated that flying over the house and surrounding grounds of plaintiffs at a level below 500 feet was certain to produce noise to which the plaintiffs have a right to object, even if in view of all the factors it did not amount to a nuisance. The court further commented upon the fact that the master had found that the noise of an airplane differs only slightly in intensity in altitudes up to 500 feet. It was held that flights of airplanes from and to airports above dwelling houses and the surrounding grounds ad-

joining the airport at less than 500 feet were tres-
passes justifying an injunction and nominal dam-
ages against the corporation operating the airport.

The case is distinguished from *Smith* v. *New Eng-
land Aircraft Co.,* 270 Mass. 511 (170 N. E. 385, 69
A. L. R. 300), wherein the flight was over unused
brush and woodland.

In *Vanderslice* v. *Shawn,* — Del. Ch. — (27 Atl.
[2d] 87, 1942 U. S. Av. 11), the court held (quoting
from syllabus [Atl.]):

"An airplane flight over another's land so low as
to interfere with the then existing use to which the
land is put, whether in landing, taking off, or other-
wise, is expressly outside the statutory definition of
'lawful flight' and is an unprivileged intrusion in
the space above the land constituting a 'trespass.'
*   *   *

"Extensive flying at low altitude, accompanied by
excessive noise and occasioning unreasonable annoy-
ance to occupants of the land below, and apprehen-
sion of danger on their part, constitutes an element
of 'nuisance' in that it interferes substantially with
the enjoyment of the property by the occupants."

The frequent operation over complainant's land
of airplanes using adjacent airport was enjoined as
constituting trespass, notwithstanding that no sub-
stantial physical injury to the property had been
done, and there was an absence of fences and bound-
ary markers between the land and airport.

The case of *Mohican & Reena, Inc.,* v. *Tobiasz,*
1938 U. S. Av. 1, was decided by the superior court
of Hampden County, Massachusetts. Although this
was not a court of last resort, the opinion has been
frequently referred to in opinions of other courts.
It was held that flying over a children's camp at such
a low altitude and so frequently that it inter-
fered with the instruction, study, pageants and

other activities of the camp, that it prevented the voices from being heard and largely destroyed the usefulness of the camp and resulted in the parents refusing to send their children back to the camp because of the danger, noise and distraction occasioned by the airplanes, was a nuisance. The court went so far as to prohibit flying closer than 500 feet laterally from the boundaries of the camp or flying at less than a height of 1,000 feet when near the camp. The same reasoning would apply with equal cogency to a large modern school house built at great expense, though we would not be willing to enjoin flying at such a distance as not to constitute a nuisance.

Article 13, § 1, of the Constitution of this State (1908), provides as follows:

"Private property shall not be taken by the public nor by any corporation for public use, without the necessity therefor being first determined and just compensation therefor being first made or secured in such manner as shall be prescribed by law."

Article 13, § 2, of the Constitution (1908) further provides that the necessity for using such property and the just compensation to be made therefor shall be ascertained by a jury of 12 freeholders residing in the vicinity of such property, et cetera. The necessity for the taking of the property for the proposed site in the instant case has not yet been determined.

The rules and regulations of the Michigan board of aeronautics (effective, as amended, April 1, 1942) provides in Section 6, p. 16, that:

"Aircraft flying over the lands and waters of the State of Michigan shall comply with the regulations of the United States civil aeronautics administration as relate to air traffic."

The civil aeronautics administration of the United States department of commerce provides that exclusive of taking off or landing upon an airport or other land area, aircraft shall not be flown below certain minimum safe altitudes of flight. The minimum provided for over property, such as plaintiffs', is 500 feet. Civil Aeronautics Bulletin No. 22 (7th Ed.), October, 1943, p. 8. Even if it be claimed that the proposed flights over plaintiffs' properties by airplanes would occur only while planes were taking off or landing, the frequency of such flights and their proximity to plaintiffs' respective properties might nevertheless cause such a nuisance as to destroy their peaceful use and quiet enjoyment.

The city in its answer to the second bill of complaint quotes from the opinion of Mr. Justice Cardozo in *Hesse* v. *Rath,* 249 N. Y. 436 (164 N. E. 342), upholding the right of the city to build an airport, as follows:

"Aviation is today an established method of transportation. The future, even the near future, will make it still more general. The city that is without any foresight to build the ports for the new traffic may soon be left behind in the race of competition. Chalcedon was called the city of the blind, because its founders rejected the nobler site of Byzantium lying at their feet. The need for vision of the future in the governance of cities has not lessened with the years. The dweller within the gates, even more than the stranger from afar, will pay the price of blindness."

At the oral argument the counsel for the city stated that the city might not use the proposed airport for the larger or heavier planes which necessarily fly much lower when landing or taking off, and could possibly cause a nuisance to plaintiffs. If the

airport cannot be used for very large airplanes, the city might find itself at the end of a side line, from which smaller craft would have to be flown to other cities which had the foresight to provide airports of a proper size in a locality free from obstacles so as to accommodate transcontinental and the other larger airplanes. We take judicial notice of the tremendous increase in the size of airplanes during the past few years.

On a motion for dismissal, it will be assumed that the pertinent, credible and uncontradicted testimony on behalf of plaintiffs is true. The testimony does raise some doubt as to whether the use of the airport by larger planes landing or taking off at a low altitude may not destroy the usefulness of the school property. It was shown that at the present airport located in the city there have been as many as 2,000 airplanes landing at or taking off in a day. It can be reasonably expected that with the growth of airplane traveling, a new and larger airport will be much busier. The present city airport is much smaller in size than the contemplated one. The length of an airport's runways is highly determinative of its suitability for more modern planes. An equally important factor is the distance of the nearby obstacles from the airport. The civil aeronautics administration has established as a glide ratio for large municipal airports the figure of 40 feet horizontally to 1 foot vertically. This means that the safe distance of an obstacle can be figured by multiplying its height in feet by 40; the resultant figure is the distance from the airport that the obstacle should be. This, however, is a minimum if the full runway is used. The testimony shows the prevailing winds will be from the southwest towards the northeast or the northeast towards the southwest a large part of the time. The direction of the wind determines the direction of the landing or take-

off.  Plaintiff's witness testified that 27 out of every 80 planes will come from over the school house, and thus 1 out of every 9 will take off in that direction and 1 out of every 5 will land from there.

The length of the runways of the proposed airport will depend largely on the way they are designed.  The northeasterly end of the one used when the winds are from the southwest or northeast may be 1,000 feet away from the school house.  It may be only 250 feet away should the city decide to make runways as long as possible.  The school house is approximately 125 feet distant from the northeast corner of the proposed airport.  The entire length of the runway is more frequently not used but, under adverse conditions, if the school were only 1,000 feet away from the end of the runway, which would be about 6,200 feet long, and if it were laid out pointing directly at the school house, using the safe running distance and safe gliding angle of 40 to 1, as propounded by the civil aeronautic administration, a very large airplane, requiring 4,500 feet take-off or landing run, might be only 67½ feet off the ground while passing over or very near the school house, or only 7½ feet above the chimney and 37½ feet above its roof.*  If the runway extended from the extreme southwest to the extreme northeast

---

\* In an article on "Some Economics of Airports," appearing in the American Society of Civil Engineers, Transactions, vol. 107 (1942), pp. 804, 810, it is stated:

"Mathematical Analysis.  In this paper attention is centered on the landing fields for land planes.  The size of an airport depends, first, upon the obstructions in the vicinity.  Until such obstructions are removed the landing area is reduced by some multiple of the height of the obstruction.  In 1925 it was officially ruled that no area could be used for take-off or landing purposes whose distance from an obstruction was less then seven times the height of the obstruction. This rule was supplanted by a ratio of 10:1 very shortly; then by 15:1; and at present by 20:1; but the new (tentative) obstruction ratios are 30:1 on runways not to be used for instrument landings, and 40:1 for those on which instrument landings are proposed.  In this paper, therefore, it will be assumed that all such obstructions have been removed, and only the net dimensions will be considered available."

corners of the proposed airport site, its length would be over 7,000 feet, but that might prove very impractical and dangerous as the termini of runways usually are kept at a safe distance from the street. If only 4,000 feet of runway were used for a large plane, and assuming such adverse weather conditions that the plane would be required to go a distance of 40 feet to rise 1 foot, plaintiffs contend that the plane would come so near the school house as to bring terror and consternation to the children and possibly to the parents, when they learned of it; the noise would be so deafening, and the vibration so great, as to interrupt the proper conduct of a school and distract its pupils. We can readily see how such conditions would constitute a nuisance and a continuing trespass.

The testimony further showed that planes in landing would have to allow about 4,500 feet of the runway to come to a rest. It is impossible to estimate with any degree of exactness the proximity that an airplane would come to the school as there are so many variable conditions. With instrument flying or under unfavorable weather conditions, the plane would come much nearer the school house than otherwise. From the record, it would appear that the planes might come so near the school house a large part of the time that it would undoubtedly constitute a nuisance. However, we are unable to state how near to the school house the planes would come, but if they do come so close as to constitute a nuisance, the further use of the airport for larger planes would be enjoined. The city should carefully consider such a possibility, which plaintiff urges as a probability, before proceeding to the enormous expense of building the airport, in the event that a jury should find that, as the city claims, the site designated is necessary.

The testimony shows that in the report of the city planning commission of Detroit, it was recommended that a very large site be obtained and that parkways or marginal areas be built along the borders of the airport so that the large number of people who are attracted to airports to watch the planes through interest or curiosity would also have the advantage of recreational and park facilities. In this way property in the immediate vicinity would not suffer damage because of the noise, light, vibration, et cetera, but its value might be enhanced because of the surrounding parks. The proposed site abuts the northern boundary of the city of Detroit. Although it possibly might be more expensive to acquire more than a square mile as a site further from the city, the difference between the cost of the proposed site and a larger one a few miles further away from the city could not be very great inasmuch as the value of land, as a rule, is in an inverse ratio to its distance from the business center of the city. It would require only a few more minutes to reach an airport 2 or 3 miles further away. If the present roads were insufficient for express highways, they could be widened so as to permit a rapid rate of speed. Such a plan was suggested in the report of the city planning commission, which was offered as an exhibit, but excluded as such by the trial judge. A marginal area is recommended by one of the few authorities on the subject (Wood on Airports, pp. 10 and 304). The city maintains that even if it were to condemn property for a larger site more distant from the city and use the outer margins for park purposes, the cost of maintenance of such parks would be very great. The city and the counties separately and jointly find the need of new parks and recreational centers and the reasonable expense of running them has not been a deterrent. It is also

worth further consideration that parks may enhance the surrounding land values, so that with larger valuations more taxes will be paid. This as well as many other questions discussed herein are legislative matters and are not to be determined by us, although they may be pertinent in the selection of an airport site. We only mention them in discussing the subject.

Airplanes may be flown at proper heights over the land below and even though there may be noises and annoyances caused thereby, they will be considered "*damnum absque injuria.*" If planes are flown at such heights as are prescribed by the authorities, as a rule they will not be enjoined. However, airplanes may not land or take off at low altitudes and in such close proximity to the property of others so as to cause a nuisance or a continuing trespass.

Defendant claims that plaintiffs should not have brought their bills of complaint but should make their objections in the condemnation proceedings now pending. Plaintiffs are not parties to these proceedings nor is it necessary for them to become such in order to protect their rights. The condemnation proceedings are for the purpose of taking private property, not public property. In *Battle Creek & Sturgis R. Co.* v. *Tiffany,* 99 Mich. 471, we quoted from a large number of cases which held that "to defeat the attainment of an important public purpose, to which lands have already been subjected, the legislative intent must unequivocally appear." Also, see *City of Detroit* v. *Judge of the Recorder's Court,* 253 Mich. 6.

Other questions raised by appellee need not be discussed in view of our decision.

In coming to our conclusions, we have not considered possible technological improvements in air-

planes that may enable them to land and take off in a very much smaller space, and that may reduce their noise. We must consider conditions as they are now and do not indulge in speculations as to the future.

The judge was correct in dismissing the bills of complaint, as the proposed airport is not a nuisance *per se,* and whether it will become a nuisance in fact can only be determined after operation. See *Sommers* v. *City of Detroit, supra,* and cases therein cited.

The order dismissing the bills of complaint is affirmed, but without prejudice to the rights of plaintiffs, or any of them, to seek injunctive or other relief should the airport be built and its operation or that of airplanes landing at or taking off from such airport result in a nuisance or continuing trespass. The questions presented being of a public nature, no costs will be allowed.

NORTH, C. J., and STARR, WIEST, BUSHNELL, SHARPE, and BOYLES, JJ., concurred. REID, J., did not sit.