## Rhoads v. Piacitelli

*J. Herbert Egan*, for plaintiff.

*Wright, Mauck, Hawes & Forrest*, for defendant.

KNIGHT, P. J., April 22, 1948.—Plaintiff seeks to have this court enjoin the operation of defendant's airport. He contends that such operation constitutes a nuisance by reason of the noise occasioned by the frequent flight of airplanes over and near his home, and also by reason of the apprehension of danger from low-flying planes. Defendant, who operates his airport for the instruction of student pilots, and for hiring, repairing and storing planes and general airport purposes, contends that his activities are conducted in a reasonable and proper manner, and not in such a way as to constitute a nuisance. The following are the

### Questions involved

1. Is defendant's airport a nuisance per se?
2. Is defendant's airport a nuisance in fact?
3. Is plaintiff entitled to an injunction?

From the record there are made the following

### Findings of fact

1. Plaintiff is the owner of real estate in Lower Providence Township containing approximately 68 acres of land, on which there are erected a stone dwelling house, a tenant house, barn, water tower, and other outbuildings. He has owned the property and lived thereon with his family, consisting of his wife and two daughters, since 1943.

566

2. In June 1945 defendant purchased a tract of land containing approximately 106 acres, more particularly described in paragraph 2 of the bill.

3. Defendant paid $25,000 for the land, and has since spent from $35,000 to $40,000 in clearing and grading the land and constructing necessary buildings, runways and hangars.

4. Defendant, trading as Valley Forge Airport, conducts on the above land an airport, where flying is taught and private planes are kept. He holds a license from the Commonwealth of Pennsylvania to operate a commercial airport.

5. Defendant owns 14 airplanes, 10 of which are used every day when flying weather permits. With one exception they are single motor planes. In addition there are about 25 privately owned planes kept at the field. Defendant gives instruction in flying and is assisted by other instructors. He has at the present time about 175 students.

6. Defendant has laid out on his airfield two runways, one extending in an easterly and westerly direction, 2,350 feet long, and the other in a northerly and southerly direction, 1,950 feet long. The north-south runway is seldom used, and in using the east-west runway, about 60 percent of the planes take off to the west in the direction of plaintiff's house, and 40 percent take off to the east, away from plaintiff's premises.

7. Planes in landing make little or no noise, and those taking off to the east, north or south, do not annoy plaintiff or his family.

8. The length of the east-west runway is 2,350 feet and the planes leave the ground from 1,750 to 1,950 feet before reaching the end of the runway, so that from the time the plane leaves the ground until it reaches the plaintiff's house, it travels a distance of from 4,150 feet to 4,350 feet in the air.

9. In training students a flight pattern is observed. When a plane takes off from the runway going west

toward plaintiff's house, it continues until a 400 feet altitude is obtained, then there is a left climbing turn until a 600 feet altitude is reached, then another left turn back parallel with the field, then another left hand turn to a landing. The distance traveled by a plane negotiating the above pattern is six to seven miles and the time required from six to seven minutes.

10. Some of the planes taking off into the west pass directly over plaintiff's home but the majority of the planes pass to the north and south of plaintiff's house, although within a short radius of several hundred feet. The planes pass over or near plaintiff's house at an average altitude of 300 feet, although some of them are higher, a few lower.

11. The planes take off from the field at intervals of from five to six minutes, and when there is good flying weather the field is in operation during the whole day, although at times the intervals between the flights are of longer duration.

12. The engines of the airplanes operated from defendant's field are all equipped with mufflers.

13. During the time defendant's field has been in operation, planes operated therefrom on training flights have been flown for 75,000 hours in the air, and there have been four accidents, none of which resulted in damage to adjoining property.

14. The planes taking off in a westerly direction from defendant's runway and passing over or near plaintiff's dwelling, necessarily make noise. The noise disturbs plaintiff and his family, particularly in the summer time when the windows are open and folks sit out of doors. At times conversation is interrupted by the noise of a passing plane, and at times it has been difficult to carry on telephone conversations.

15. Defendant operates his field at night, and the night flying planes disturb the sleep and rest of plaintiff and his family.

16. It would be highly dangerous for planes operated from defendant's field, under normal conditions, to take off and attempt to attain an altitude of 500 feet before reaching plaintiff's house.

17. Except as to the night flying, the air field of defendant is operated in a reasonable and proper manner.

18. The operation of the field after 10 o'clock at night is unreasonable under the circumstances.

19. The air field of defendant is situated in what might fairly be termed a rural neighborhood, although the Village of Audubon is within a half mile of defendant's propery, and the Audubon Elementary School is about 1,000 feet from the northerly edge of the air field.

20. The operation of the air field does not interfere with or annoy the teachers or scholars of said school.

21. The airport is located in a neighborhood suited for such a project.

22. The operation of the airport by defendant does not affect the comfort of plaintiff and his family to an unreasonable extent, and will not adversely affect the health of ordinary people.

## Discussion

The legal principles relevant to this case are succinctly stated by the Supreme Court of Pennsylvania in the very recent case of Crew et al. v. Gallagher et al., 358 Pa. 541 (1948), at page 543, as follows:

"Since this is a case of first impression in Pennsylvania, it seems advisable to summarize the few basic legal principles involved. It has been held in other jurisdictions that an airport is not a nuisance per se: Batcheller v. Commonwealth, 176 Va. 109, 10 S. E. 2d 529; Smith v. New England Aircraft Co., Inc., 270 Mass. 511, 170 N. E. 385; Warren Twp. Sch. Dist. v. Detroit, 308 Mich. 460, 14 N. W. 134; that it may become a nuisance in fact from the manner of its construction or operation; Swetland v. Curtiss Airports Corporation, (C. C. A. 6 Cir.) 55 F. 2d. 201;

Thrasher v. City of Atlanta, 178 Ga. 514, 173 S. E. 817; see C. J. S. Aerial Navigation, §29; that the question whether a nuisance has been created depends on the circumstances of the particular case, for not every inconvenience, discomfort or annoyance is sufficient to constitute a nuisance: 39 Am. Jur., Nuisances, §30. See Penna. Co. v. Sun Co., 290 Pa. 404, 138 A. 909."

In 6 Am. Jur., Aviation §16, the following appears:

"An airport may become a nuisance either from the manner of its construction or by its operation. A private airport, flying school, or landing field is not a nuisance per se. It can be regarded as a nuisance only if it is in an unsuitable location or if it is operated so as to interfere unreasonably with the comfort of adjoining property owners. An airport may be held to be a nuisance because of the dust, noise, congregation of crowds, and apprehension of danger."

In Smith v. New England Aircraft Co., Inc., et al., 270 Mass. 511, 170 N. E. 385, it was held even though the noise incident to the flight of the aircraft over one's land and residence in the vicinity of an airport is a source of irritation and annoyance, it does not constitute a nuisance if it is not such as to be harmful to the health or comfort of ordinary people and to cause fright and apprehension of personal danger or of injury to livestock or property.

In a number of cases in other jurisdictions, the operation of an airport has been enjoined as a nuisance for various reasons. In Mohican & Reena v. Tobiasz, a decision of the Superior Court of Hampden County, Massachusetts, reported in 1938 U. S. Av. R. I., the constant noise of airplane flights over a children's camp, interfering with the rest of the children and interrupting other camp activities, was held to be a nuisance. In Swetland v. Curtiss Airports Corp. (C. C. A. 6), 55 F. (2d) 201 (1932), the operation of an airport was enjoined because of the interference

with plaintiffs' enjoyment of their residential properties by reason of excessive noise and dust even under "normal" operation, attraction of crowds, traffic congestion, brilliant illumination at night, and substantial depreciation in value of plaintiffs' property, where it appeared, in considering the balance of convenience, that defendants could readily transfer their airport activities to other available sites equally accessible to a metropolitan center.

In Pennsylvania there appear to be but two reported cases bearing on the question of airports as nuisances. Both arose in Chester County. In Gay et al. v. Taylor et al., 19 D. & C. 31 (1932), the airport conducted by defendants was held to be a private nuisance because of noise of planes in taking off, in full flight and in landing, noise from a loud speaker maintained at the field, dust stirred up not only by plane propellers but principally by large numbers of automobiles using a driveway adjacent to the property of one of plaintiffs, the congestion of crowds, many of whom trespassed upon plaintiffs' property, and apprehension of danger from planes flying at low altitude, particularly when taking off and landing.

In Crew v. Gallagher, supra, the lower court enjoined the operation of an airport as a nuisance, where it was located in a neighborhood containing a hospital, school, farms for raising high-bred livestock and chickens, a week-end retreat and country residences. However, upon appeal, the Supreme Court reversed, dissolving the injunction and dismissing the bill. The court held that plaintiffs had failed to sustain their burden of proof, saying at page 548:

"They have not shown any damage to their property or its use, or that they have suffered any material discomfort. The testimony discloses no additional volume of objectionable noise in comparison with the existing noise level in the immediate vicinity of the proposed airport. Farm tractors, passenger cars and

heavy trucks on the adjacent highway, trains on the main line of the railroad nearby, the military and transport aircraft having no connection with the airport in question, already disturb the tranquillity of this neighborhood. 'No one is entitled to absolute quiet in the enjoyment of his property; he may only insist upon a degree of quietness consistent with the standard of comfort prevailing in the locality in which he dwells.' Collins v. Wayne Iron Works, 227 Pa. 326, 331, 76 A. 24."

The court also pointed out that the action had been instituted a short time after construction of the field had begun and before any planes had used the airport, and that therefore much of the testimony adduced by plaintiffs was necessarily conjectural and speculative as to what might occur in the future. The court observed that "After the establishment of a regular flight traffic pattern, if airplanes fly very close to plaintiffs' buildings, or in any other way cause real damage to plaintiffs' property, adequate relief in equity will be available to them".

In the present case, the chancellor has found that defendant has (except as to operations at night), conducted his airport in a reasonable manner. This finding is fully warranted by ample credible testimony. An assistant inspector for the Pennsylvania Aeronautics Commission testified that the runways were of adequate length; that defendant has in all respects complied with State regulations in the construction and operation of his airport; that the flight traffic pattern in use was established in accordance with accepted procedure from a safety standpoint, having been altered in order to minimize annoyance to nearby residents; that defendant's operations have been of the "highest caliber" so far as the State Aeronautics Commission is concerned, so that it has never been necessary to warn or reprimand him; that it would increase the danger factor for planes such as are used

by defendant in instructing to attempt to reach an altitude substantially in excess of 300 feet when reaching a point over plaintiff's property.

Defendant himself testified that all planes making regular use of his airport were, with one exception, single motored planes; that all were equipped with mufflers; that in accordance with his instructions, all planes in training flight avoid plaintiff's property so far as possible, consistent with good flight procedure and in view of safety factors; that planes taking off from his airport never pass over plaintiff's property at so low an altitude as 50 to 75 feet, for to do so would require "dropping down" a plane after clearing trees and other obstacles at the edge of the field, which would be contrary not only to his instructions but contrary to law that it would be a rare occasion for planes to take off from his field at intervals of less than five or six minutes, and that 60 percent of training planes "took off" to the west, in the direction of plaintiff's property, and 40 percent to the east or opposite direction.

Plaintiff and his witnesses (largely nearby residents), gave testimony that planes on numerous occasions flew over his property as frequently as every three minutes; that they frequently flew as low as 50 or 75 feet over his home, although the average altitude was 200 feet; that planes operate as late as 11 o'clock at night; that on occasion the planes in low flight caused their stone home to vibrate, and caused leaves to be blown from trees; that the noise was of such an intensity and frequency as to interfere with ordinary conversation, particularly in warm weather when windows were open; and that low flights caused apprehension of danger.

Certain difficulties attend the decision of a case of this sort. How much annoyance must a party suffer before he is entitled to injunctive relief? As said in

Swetland v. Curtiss Airports Corp., 41 F. (2d) 929, (1930), at page 932:

"It is obvious that although aviation is still to some extent in the experimental stage, it is of great utility in times of peace, and will be a great protection to the nation in times of war. In fact, it is indispensable to the safety of the nation that airports and flying schools such as contemplated by the defendants be encouraged in every reasonable respect. An airport, landing field, or flying school can be regarded as a nuisance only if located in an unsuitable location (citing cases) or if operated so as to interfere unreasonably with the comfort of adjoining property owners."

In Warren Twp. School District v. Detroit, 308 Mich. 460, 14 N. W. (2d) 134, it was said at page 469:

" 'Aviation is a lawful business and the owner of real estate has the right to establish an airport thereon if it is properly located and properly operated notwithstanding for aesthetic and sentimental reasons it may not be agreeable to persons owning fine country homes in the community.' "

In a sense, the science or business of aviation is a new and growing business, essential to the needs of the public for commercial as well as military purposes. Courts have long adhered to the policy of adapting the law to the economic and social needs of the times. While there is a contrariety of opinion on the point, we feel the public interest is a factor in the decision of this case. In Wentz v. Philadelphia, 301 Pa. 261 (1930), recognition was given to that public interest. It is also true that while the establishment of an airport in a thickly settled residential area might prove to be a nuisance, nevertheless it is necessary for the successful operation of an airport that it be located not too remote from centers of population.

In the final analysis, a case such as this requires a balancing of the conveniences and equities of the parties. Undoubtedly, plaintiff has experienced and will

in the future experience much inconvenience. However, a careful consideration of the testimony has convinced us that the evidence as to plaintiff's annoyance and inconvenience is exaggerated and unconsciously colored, either by the result he wishes to accomplish, or by his limited power of observation, and that although plaintiff is inconvenienced in some respects, the testimony considered as a whole convinces us that others in the neighborhood do not consider the noise of planes disturbing.

In view of all the testimony, and the good record of defendant's operations with regard to accidents, plaintiff's complaints as to apprehension of danger appear fanciful rather than real, and we take no notice of them.

From the foregoing facts and discussion, there are drawn the following

### Conclusions of law

1. Except as to night flying, defendant conducts his airport in a reasonable, proper and legal manner.

2. Except as to night flying, the operation of defendant's airport does not constitute a nuisance.

3. Plaintiff is entitled to relief to the extent that defendant should be enjoined from operating his airport as a flying school later than 10 o'clock at night.

4. Costs should be divided between the parties.

And now, April 22, 1948, it is ordered, adjudged and decreed that the prothonotary mark these findings of fact and conclusions of law filed, to become a part of the record in this case, and enter the following

### Decree nisi

1. Defendant is enjoined from operating his airport as a flying school after 10 o'clock p.m.

2. In other respects, the prayers of plaintiff's bill are refused.

3. Plaintiff and defendant shall each pay his own costs, and defendant shall pay the record costs.

Notice to be given by the prothonotary as required by the rules of equity practice, that unless exceptions shall be filed within 10 days from this date, the decree nisi will become the final decree as of course.